**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donald Lee KAPPERMAN,
Defendant-Appellant.**

No. 84–8315.

United States Court of Appeals,
Eleventh Circuit.

July 1, 1985.

Rehearing and Rehearing En Banc
Denied Aug. 7, 1985.

Joseph Shemaria, Beverly Hills, Cal., August F. Siemon, Atlanta, Ga., for defendant-appellant.

William McAbee, Savannah, Ga., for plaintiff-appellee.

Before KRAVITCH and CLARK, Circuit Judges, and PECK *, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Following the denial of a motion to suppress, appellant Donald Kapperman pleaded guilty to possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), and nolo contendere to importation of cocaine, 21 U.S.C. §§ 952(a), 960, conspiracy to import cocaine, 21 U.S.C. § 963, and conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 846. Pursuant to Federal Rule of Criminal Procedure 11(a)(2),

* Honorable John W. Peck, U.S. Circuit Judge for    the Sixth Circuit, sitting by designation.

Kapperman conditioned his pleas by reserving the right to appeal from the denial of the motion to suppress. We affirm the district court's order.

## I. BACKGROUND

On August 4, 1983, detectives from the Ware County, Georgia sheriff's office learned from an informant that a guest staying at a Waycross, Georgia hotel was acting suspiciously. This guest emerged from his room only once each day, to pay his bill in cash, and all his meals were provided by the hotel's room service in double portions. The guest had registered at the hotel in the name of D.L. Warren, using a Las Vegas, Nevada address, and had placed several long distance phone calls from his room, the numbers being recorded at the hotel desk. The sheriff's office began an investigation, stationing Detective Watts at the hotel to observe the guest more closely. To verify the registration information, Lieutenant Herrin called the Las Vegas Police Department, and learned that a Las Vegas policeman, who was vacationing somewhere in the South Georgia or North Florida area, lived at the address listed on the card. His name, however, was not D.L. Warren, nor was his description similar to the physical characteristics of the guest under investigation.

Herrin then provided the United States Customs office with a list of the phone numbers dialed from the guest's hotel room. One of the numbers that had been called several times was listed in the name of D.L. Kapperman,[1] a fugitive from justice in connection with a marijuana smuggling charge in Arizona. The detailed description the Customs office provided of Kapperman—six feet tall, weighing between 225 and 235 pounds, reddish-brown hair and beard, with the beard graying at its bottom, and a penchant for wearing western style clothing—matched the guest who claimed to be D.L. Warren.[2] Further investigation revealed that the only means of transportation in the area that was registered to D.L. Warren was an airplane equipped with a short-wave radio and a device for dropping bundles. There was no flight plan for the plane filed with the local airport.

Because police suspected that there was another person staying in the room with Kapperman they continued their surveillance of the hotel. Early the next morning, Alfredo Cervantes arrived at the hotel by car and entered Kapperman's room. A short while later, the pair emerged from the room and left the motel in Cervantes' car, heading toward the Ware County airport. Police followed the car, but became lost in traffic when the car took evasive action near the airport. Officers trailing the vehicle radioed a description of the car to another patrol unit, driven by Deputy Head, instructing him to stop the car and detain Kapperman for questioning. Deputy Head stopped the car in front of the Ware County Courthouse on a heavily travelled street. Detective Watts arrived on the scene about five minutes later, with Lieutenant Herrin following right behind.

Herrin found Kapperman in the rear seat of Deputy Head's patrol car, removed him from the vehicle, and asked for identification.[3] Kapperman produced a Nevada driver's license in the name of D.L. Warren. Not satisfied with this, Herrin asked him if he was D.L. Kapperman. When Kapperman answered affirmatively, Herrin confronted him with the drug-smuggling charges. Kapperman responded that he was familiar with the charges. At this point, Herrin told Kapperman he was under arrest.

Meanwhile, Watts asked Cervantes, who was standing outside his car, for his driver's license. Cervantes replied that his

---

1. There are indications in the record that the phone number may have been listed in the name of Kapperman's wife.

2. The description may have included Kapperman's age and the fact that he wore glasses.

3. Both Herrin and Watts testified that Kapperman may have been in handcuffs when they arrived on the scene. *See infra* note 4.

briefcase containing his identification was in the car's back seat, but agreed to produce some identification if Watts retrieved the briefcase. After examining the identification, Watts explained to Cervantes that police had stopped his vehicle because they believed his passenger was a fugitive whom they suspected was involved in a drug-smuggling operation. Watts then asked Cervantes if he would allow a search of the vehicle. After consenting orally, Cervantes signed a printed form stating his acquiescence. Police drove the vehicle to a nearby parking lot so as to avoid blocking traffic any longer. A search of an unlocked suitcase found in the car's trunk revealed cocaine. Cervantes was then arrested.

In the court below, Kapperman sought to suppress (1) the statements he made in response to Lieutenant Herrin's questions and (2) the cocaine. He alleged that the statements were made without benefit of *Miranda* warnings, and that Cervantes' consent to the search was the product of (1) the *Miranda* violation, (2) the unlawful detention of Kapperman, (3) the unlawful detention of Cervantes. In an order denying

Kapperman's motion, along with motions filed by Cervantes and another codefendant, the district court held that Kapperman was not in custody when he made the statements, and that neither Cervantes nor Kapperman was unlawfully detained.

## II. WAS APPELLANT OR CERVANTES UNLAWFULLY SEIZED?

### A. *Kapperman*

Appellant concedes that the initial decision to stop Cervantes' car was permissible under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. He contends, however, that after the lawful initial stop, he was removed from the car, handcuffed, and placed in the back of Deputy Head's patrol car. According to appellant this action converted the stop into an arrest, requiring probable cause. Appellant contends that until he revealed his identity, the police did not have probable cause.

Assuming that the restraint in question was tantamount to an arrest,[4] we conclude that there was probable cause to

---

4. It is not clear from the record whether Kapperman was in handcuffs while he waited in the patrol car. At the suppression hearing both Herrin and Watts testified that they were not sure whether Kapperman was handcuffed when they arrived on the scene. Nevertheless, Kapperman was in the back of the patrol vehicle at the time so his freedom of movement was restrained. Yet, neither handcuffing nor other restraints will *automatically* convert a *Terry* stop into a *de facto* arrest requiring probable cause. Just as probable cause to arrest will not justify using excessive force to detain a suspect, *Tennessee v. Garner*, — U.S. —, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest. The inquiry in either context is reasonableness.

Unquestionably, a *Terry*-type stop is a seizure subject to fourth amendment constraints. *Terry* carved out a narrow exception to the probable cause requirement, allowing police to detain a suspect based upon reasonable suspicion. *United States v. Sharpe*, — U.S. —, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Hensley*, — U.S. —, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*,

392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Police may take reasonable action, based upon the circumstances, to protect themselves during these encounters, or to maintain the status quo. *See Hensley*, 105 S.Ct. at 684 (reasonable for one police officer approaching vehicle containing two men, one of whom he suspected was wanted for an armed robbery committed six days earlier, to draw his gun); *United States v. Taylor*, 716 F.2d 701, 707–09 (9th Cir.1983) (armed approach by two agents reasonable where suspects were considered dangerous; handcuffing of one suspect justified in a *Terry* stop when suspect twice disobeyed order to raise hands and made furtive movements inside car); *United States v. Roper*, 702 F.2d 984, 988 (11th Cir.1983) (officers' direction that two passengers exit vehicle, and initial officer's drawing his gun, not unreasonable).

Because no one testified about the events that transpired immediately upon the stopping of the vehicle, we are unable to discern whether the actions were reasonable. It is the government's burden to demonstrate that a seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion).

arrest Kapperman before he admitted his identity to Lieutenant Herrin. Probable cause to arrest exists when "the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." [5] *United States v. Pantoja-Soto,* 739 F.2d 1520, 1523 (11th Cir.1984). By the time Kapperman was detained, police had observed him for several hours. They knew he matched the detailed description, provided by the United States Customs office, of a fugitive from justice. *Cf. United States v. Roper,* 702 F.2d 984, 989 (11th Cir.1983) (printout received from the National Crime Information Center is reliable information sufficient to establish probable cause to arrest). Some of the phone calls he placed corroborated their belief. Police also were aware that Kapperman had given a false address when registering at the hotel. Moreover, police had learned that Kapperman had probably arrived in the Waycross area using an airplane equipped with devices used in drug-smuggling operations, and that Kapperman had fled drug-smuggling charges in Arizona. Finally, the car in which he was a passenger took evasive actions while being followed by the police. We conclude that this information would give a reasonably cautious person ample basis for believing that appellant was committing a crime by being a fugitive from justice. Accordingly, the police had proba-ble cause to arrest Kapperman before they confirmed his identity.

### B. *Cervantes*

Turning to the circumstances surrounding the detention of the driver of the vehicle, we note that unlike Kapperman, Cervantes stood outside his vehicle during most of the investigation. After he consented to a search of the vehicle, the police moved their investigation to the local courthouse parking lot, about 250 yards from the site of the initial stop. Herrin drove Cervantes' car, while Cervantes rode in one of the patrol vehicles. When police discovered the cocaine, Cervantes was arrested.

Appellant urges that Cervantes was illegally detained, which in turn tainted his consent to the search of the vehicle.[6] We disagree. The Supreme Court has recognized that certain brief detentions by law enforcement officials do not rise to the level of an arrest and may be based on less than probable cause. *See, e.g., United States v. Sharpe,* —— U.S. ——, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Hensley,* —— U.S. ——, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court described the kind of stop that may be made if supported by reasonable suspicion:

> A brief stop of a suspicious individual, in order to determine his identity or to

---

**5.** That Deputy Head may not have known all of the facts already uncovered in the investigation does not render the "arrest" unlawful. When there is minimal communication between different officers, we look to the collective knowledge of the officers in determining probable cause. *United States v. Astling,* 733 F.2d 1446, 1460 (11th Cir.1984). Further, Head was entitled to act on the strength of the radio communication directing him to "stop the vehicle and secure the scene." *See Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971).

**6.** We assume for purposes of this argument, and for purposes of section IV, that Kapperman had a reasonable expectation of privacy in the items searched. Unless he did, he would not have "standing" to seek suppression of the cocaine on these bases. *See Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Given the government's failure to raise this question, we do not address it. *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 1646–47, 68 L.Ed.2d 38 (1981). Of course, Kapperman's expectation of privacy in the searched items is not relevant to our discussion in sections IIA and III. Those sections evaluate claims that police infringed *his* constitutional rights, and Kapperman does have standing to allege that the cocaine was the "tainted fruit" of these alleged violations. *See Rakas,* 439 U.S. at 150–51, 99 S.Ct. at 434–35 (Powell, J., concurring); 1 W. LaFave & J. Israel, Criminal Procedure § 9.1(d) (1984).

maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officers at the time.

*Id.* at 146, 92 S.Ct. at 1923. An investigatory stop must be justified at its inception, and its scope must be reasonably related to the circumstances that permitted the intrusion at the outset. *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

■ Examining the nature and degree of the intrusion on Cervantes' freedom of movement, we conclude that until Cervantes was formally placed under arrest, the police action amounted to nothing more than a *Terry* stop, supported by reasonable suspicion. Certainly, their decision to stop the vehicle was warranted. *See United States v. Hensley,* — U.S. —, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (policeman who had seen a "wanted flyer" issued from another police department had reasonable grounds for stopping person named in flyer); *United States v. Roper,* 702 F.2d 984, 988–89 (11th Cir.1983) (flyer issued by bail bonding company provided reasonable suspicion for stopping individual described therein). Once they made the initial detention, police were justified in not permitting Cervantes to drive away from the scene after they removed Kapperman from the vehicle. To be sure, the police did not know Cervantes at the time of the initial stop. Yet Cervantes, with an individual believed to be a fugitive as his passenger, had taken steps to elude police while being followed. Moreover, police suspected Cervantes' passenger had arrived in the area in an airplane equipped with devices used in drug-smuggling operations, and the two men were on their way to the airport. Thus, we conclude that police had reasonable suspicion to detain Cervantes while they learned Kapperman's identity.

■ Turning to the scope of the intrusion, we note that there is no question but that police acted diligently in pursuing their investigation. *See Sharpe,* 105 S.Ct. at 1575–76. Cervantes was detained only long enough to enable one of the officers in charge of the investigation, Watts, to ask Cervantes for identification and explain why he was being detained.[7] The only reason Cervantes was delayed as long as he was, approximately ten minutes, was because en route Watts had lost sight of the vehicle. *See id.* at 1576 (upholding 20-minute detention where police acted diligently). Nothing in the record indicates that police used threats or force to restrain Cervantes. In fact, before Detective Watts retrieved the briefcase containing Cervantes' identification, he asked Cervantes for permission to enter the vehicle.

■ Once Cervantes consented to the search, it cannot reasonably be asserted that moving the investigation or requiring him to ride in the patrol car to a nearby place where the search would be conducted converted a lawful investigatory stop into an arrest. To conduct the search at the site of the initial stop would have unduly impeded the traffic moving along the busy street. Thus police acted reasonably in moving to a nearby area. *See United States v. Munford,* 431 F.Supp. 278 (E.D. Pa.1977). Not permitting Cervantes to drive to the scene in his vehicle was also reasonable under the circumstances. Cervantes could have used this as an opportunity to escape, thereby endangering the police and other drivers. Further, Cervantes might have attempted to hide or destroy contraband lying in the vehicle if allowed to drive his car. We conclude that the stop was reasonably related in scope to the circumstances that justified it initially. Accordingly, Cervantes was not arrested until after police discovered the cocaine, at which point probable cause had arisen.

7. It was appropriate for Deputy Head to hold Cervantes and Kapperman for the brief period pending the arrival of Watts and Herrin. Head was not one of the officers who had participated in the earlier investigation. Thus, it would be unreasonable to hold that the detentions were illegal because Head waited for the other officers to arrive rather than conduct his own inquiry. *See Sharpe,* 105 S.Ct. at 1576 n. 5.

## III. WAS THE SEARCH TAINTED BY THE ALLEGED *MIRANDA* VIOLATION?

Appellant next asserts that the questions posed by Herrin after he produced the driver's license in the name of D.L. Warren constituted custodial interrogation, and should have been preceded by the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Failure to administer the warnings, according to appellant, requires suppression of the cocaine because Cervantes' consent to the search was tainted by the illegal police conduct. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

We assume for purposes of this case that the statements were taken in violation of *Miranda*.[8] The more important question presented is whether this would require suppression of the cocaine. Unlawful police conduct requires suppression of evidence only if there is a causal connection between the conduct and the evidence in question. *United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir.1982), *cert. denied*, 461 U.S. 933, 103 S.Ct. 1253, 77 L.Ed.2d 306 (1983). Thus, the government may introduce evidence obtained from a source independent of the primary illegality. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *Bailey*, 691 F.2d at 1013; *United States v. Ible*, 630 F.2d 389, 393–94 (5th Cir.1980).[9] To that extent, evidence that is not the "fruit" of prior unlawful police conduct need not be excluded. In determining whether there is a nexus between the evidence in question and the police conduct, our inquiry is essentially a common sense evaluation of the facts and circumstances of the particular case. *Williams v. United States*, 382 F.2d 48, 51 (5th Cir.1967).

The means used to discover the cocaine was the search, consented to by Cervantes. Searches conducted by means of consent are valid so long as the consent is voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973); *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983); *United States v. Horton*, 488 F.2d 374, 379 (5th Cir.1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). The court below concluded that Cervantes' consent was voluntary, a finding we can overturn only if it is clearly erroneous. *Espinosa-Orlando*, 704 F.2d at 512. Although in some circumstances unlawful police action could taint a detainee's consent to search, *see Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion), such a conclusion is not warranted here. When the police arrived on the scene, they already had a strong belief that "D.L. Warren" was in fact D.L. Kapperman. Starting with this assumption, Herrin questioned Kapperman while Watts spoke with Cervantes. After reading Cervantes' identification, Watts explained that they believed Cervantes was travelling with a fugitive wanted on drug charges and that they wished to search the car because they suspected that it might contain drugs. Cervantes consented to the search. Thus, Watts and Herrin simultaneously were proceeding independent of one another. Nothing in the record suggests that Watts' request for Cervantes' permission to search the car, or Cervantes' consent, was triggered by Kapperman's admission of his identity, or even that this in any way affected the consent.[10] In fact, it is not even

---

8. Whether or not the police should have given *Miranda* warnings is not really the important question. Kapperman's admission that he was a fugitive from justice would be relevant to a prosecution for charges stemming from Kapperman's fugitive status. This admission would not have been necessary to establish Kapperman's guilt on the drug charges.

9. The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

10. Failure to administer *Miranda* warnings can at the most be said to have led Kapperman to admit to something police were already reasonably certain of before Herrin posed his ques-

alleged that at the time police obtained the consent, Cervantes was aware of the substance of the exchange between Kapperman and Herrin. Hence, we conclude that Cervantes' consent was not tainted by the alleged *Miranda* violation.[11]

## IV. DID THE SEARCH EXCEED THE SCOPE OF CERVANTES' CONSENT?

Finally, Kapperman argues that the search of the suitcase was unlawful. The consent form signed by Cervantes, appellant contends, did not authorize police to open discrete containers found inside the car. Because the cocaine was found in a suitcase, appellant urges us to conclude that police exceeded the bounds of Cervantes' consent.[12]

Kapperman never raised this argument in the court below, although Cervantes did advance this argument in favor of suppression. In any event, in *United States v. Covello*, 657 F.2d 151 (7th Cir.1981), the Seventh Circuit rejected a challenge identical to the one presented here. Reviewing a district court opinion that held that an individual's consent to search his car did not include authorization to search luggage found inside of the car, the court reversed, noting that the interpretation of the signed consent form was crucial to the case. 657 F.2d at 154. The form authorized the agents "to conduct a *complete* search" of the car, and permitted the searching agents to remove from the vehicle any property contained therein. *Id.* Thus, the court concluded, the signed consent form authorized the questioned conduct. *Id.* To bolster its decision, the court evaluated the circumstances surrounding the property

owner's decision to consent, concluding that they were consistent with a complete search of the vehicle. *Id.* at 154–55.

We find the *Covello* court's reasoning persuasive. Examining the consent form signed by Cervantes we note that it authorized the police to search his car and to remove "whatever documents or items of property whatsoever, which they deem pertinent to the investigation...." This language is consistent with permitting police to search the unlocked suitcase, as documents or other items of property cannot necessarily be expected to be lying loose in an automobile. 657 F.2d at 154. Appellant asserts that unlike the consent form construed in *Covello*, the form signed by Cervantes did not grant the police the right to conduct a "complete" search of the automobile. We are not convinced, however, that the absence of the word "complete" automatically limits the scope of the consent. Although offered in a different context, we deem the following statement to be relevant here: "A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820, 102 S.Ct. 2157, 2170, 72 L.Ed.2d 572 (1982). Cervantes' authorization permitted a search of unlocked luggage contained inside the vehicle, because the officers could reasonably assume that the narcotics would be found there. *See United States v. White*, 706 F.2d 806, 808 (7th Cir.1983). Moreover, there is no indication that Cervantes objected to the opening of the suit-

tions—that he was the D.L. Kapperman who was wanted in Arizona. If police had told Kapperman of his right to remain silent, or his right to counsel, Kapperman could have responded as he did or told Herrin that he would not respond to questioning. At that point, there can be no doubt that police would have arrested Kapperman anyway. And, as pointed out in section II, they would have had the requisite probable cause to do so.

**11.** In any event, the Supreme Court's recent decision in *Oregon v. Elstad*, —— U.S. ——, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), calls into

question whether a *Miranda* violation prevents the prosecution from introducing, in its case-in-chief, anything other than the unwarned statements themselves. *Id.* 105 S.Ct. at 1292–93; *see United States ex rel. Hudson v. Cannon*, 529 F.2d 890, 894–95 (7th Cir.1976). *Cf. Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (refusing to exclude third-party testimony obtained as a result of unwarned statements made during pre-*Miranda* interrogation).

**12.** *See supra* footnote 6.

case, or that he intended to limit the search in the manner appellant suggests. *See United States v. Dichiarinte,* 445 F.2d 126 (7th Cir.1971). We conclude therefore that police did not exceed Cervantes' acquiescence by opening the luggage contained inside the vehicle.

For the foregoing reasons, the decision of the court below is AFFIRMED. Consequently, we affirm the adjudication of guilt.