**UNITED STATES of America, Plaintiff,**

v.

**Gavin Anthony McBEAN, Defendant.**

**No. CR487–97.**

United States District Court, S.D. Georgia, Savannah Division.

Nov. 18, 1987.

Frederick Kramer, Asst. U.S. Atty., Savannah, Ga., for plaintiff.

Charles Steinberg, Rochester, N.Y., Gordon Bonding Agency, Ancil Gordon, Jr., Savannah, Ga., for defendant.

ORDER

EDENFIELD, District Judge.

Before the Court in this criminal action is defendant's motion to suppress certain evidence obtained pursuant to a warrantless search of an automobile.

On November 5, 1987 the Court received evidence and heard arguments with reference to defendant's motion to suppress. The findings of fact, and a number of legal conclusions were made and ruled upon

from the bench. A final issue was left unresolved, to be briefed by the parties. The Court's ruling on that issue is the basis of this Order. The Court's verbal order of November 5 will not be reiterated in full herein. However, for purposes of background, a brief summary is provided.

This case involves the stop and subsequent search of a vehicle driven by Gavin Anthony McBean. The stop and search was conducted by the ubiquitous Georgia State Trooper, B.E. Hodges ("Hodges").

At 3:53 A.M. on October 7, 1987, Hodges was parked in the median of I–95 at about the 101 mile post. Hodges observed a car, heading north, traveling too closely behind a tractor-trailer. Hodges pulled out and followed the car with intent to stop the driver for what was a traffic violation and otherwise an unsafe driving pattern. Before engaging his police lights, Hodges noticed some weaving of the car. Hodges pulled the car over and approached the driver.

A video camera is installed in Hodges' vehicle. Just prior to stopping the car, Hodges began taping the events that were to follow. The VCR tape was tendered into evidence at the hearing, and, in many respects, speaks for itself. A viewing of the tape demonstrates that Hodges, after casually chatting with McBean, issued warning citations to the driver for tailgating and weaving. Hodges then asked McBean for permission to search his vehicle. Permission was orally given. Hodges obtained a written consent form and asked the defendant if he could read. The defendant replied that he could read; however, when presented with the waiver, the defendant signed it without a scan. Hodges then explained to the defendant what he had signed, and read the form[1] out loud.

Hodges began his search, and, when he reached the trunk, found a closed luggage bag. Hodges zipped open the bag and found within some sixty pounds of marijuana.

The Court found at the hearing that Hodges' initial stop of defendant's vehicle was not pretextual, thus not at odds with *United States v. Smith*, 799 F.2d 704, 708 (11th Cir.1986). In *Smith* a state trooper stopped a car without any reasonable justification, thereby violating the fourth amendment. There, the Circuit Court found that the stop of the vehicle was based on a hunch that drugs would be found, because the car, and its occupants, fit an "I–95 drug courier profile." In the case *sub judice* there was no indication that there was enough time or enough light to allow Hodges adequately to view and conclude that the vehicle and its driver fit a "drug courier profile." The Court credited Trooper Hodges' testimony that his determination to stop the vehicle came at the time he noticed the unsafe tailgating. No "profile" could have been identified at that time. The stop of the defendant was based on an identifiable and particularized reason and, therefore, did not offend the fourth amendment.

The Court also held that the consent given by the defendant was voluntarily rendered. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981). There was no sign of coercive police procedure, nor was there evidence of a language or other communication barrier between the defendant and the trooper. The fact that the defendant, after being given the opportunity to read the waiver, signed it without reading it, is of little significance. Trooper Hodges explained clearly, after the signing, that the defendant had the right to refuse the search, and that his signing signified that no coercion of any type was being used against him. As the Court noted at the hearing, to have required Hodges effectively to tear up the old waiver and have the defendant sign a new one, after reading it the second time, would have been to place form over substance. The defendant voluntarily signed, and was obviously ready to do so; he had already rendered a voluntary verbal waiver before the written waiver was ever produced. Moreover, the verbal

---

1. One part of the form, dictating the scope of the search, was not read by Hodges. The Court's decision herein focuses on this omission.

exchange after the signing of the written waiver purged any taint in the voluntariness of the consent that could be said to have existed by virtue of defendant's failure to read. The consent was voluntary.

The final issue, left unresolved at the hearing, was whether the consent given by the defendant was wide enough in scope to have included the closed suitcase, located in the trunk.[2] It should be made clear at the outset that, although this case involves the warrantless search of a container found in an automobile, the Court is not faced with a *Carroll/Ross* situation. *Carroll v. U.S.*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), provides that, when there is probable cause to search a vehicle, the mobility of the vehicle will provide exigent circumstances, thereby precluding an official's need to obtain a warrant before searching the car. *U.S. v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) expands *Carroll* by holding that, when officials have probable cause to search a vehicle, all containers and receptacles within the car that could possibly contain the object of the search, are, like the car itself, subject to the warrantless search under exigent circumstances.

The instant case is not one based on probable cause,[3] but, rather, based on the "consent exception" to the fourth amendment. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1972). Specifically, the Court is here concerned with the scope of the consent, for "[i]f a search is conducted pursuant to a consent, any part of the search not within the bounds of the consent is unlawful." *United States v. White*, 541 F.Supp. 1114 (N.D.Ill.1982) (*citing Honig v. United States*, 208 F.2d 916 (8th Cir.1953)).

*United States v. Kapperman*, 764 F.2d 786 (11th Cir.1985) is the predicate case,

and that upon which the government relies. One facet of *Kapperman* is squarely on point: The driver of a car signed a written consent, authorizing a search of his vehicle. Kapperman, a passenger in the car having standing to challenge the search, contended that the waiver did not authorize the police to open discreet containers found inside the car. Cocaine had been found during the search in a closed but unlocked suitcase that was located in the car's trunk.

The *Kapperman* court, relying on the reasoning employed by the Seventh Circuit in *United States v. Covello*, 657 F.2d 151 (7th Cir.1981), held that the terms of the waiver, read in conjunction with the circumstances surrounding the giving of the consent, dictate the scope of the search. 764 F.2d at 794. The *Kapperman* court found that because the signed waiver in that case authorized the police to search the car and to remove "whatever documents or items of property whatsoever, which they deem pertinent to the investigation," and because the officers had indicated to the consenter that the object of the search was drugs, the scope of the search fairly included any closed containers found within the car, in which drugs reasonably could be located. *Id.*

The Court would like to focus on *Kapperman* for a moment. The government has presented, in its brief to the Court, a reading of *Kapperman* which, if correct, would allow for quick disposal of the instant motion. The government contends that "[t]he Eleventh Circuit [in *Kapperman*] took the rule for the extent of warrant and probable cause searches directly from *Ross*, and, by analogy, applied it to consent searches, holding that despite whatever specific terms were found in the written consent, such an 'authorization permitted a search of unlocked luggage con-

---

**2.** The government conceded at the hearing that the defendant has standing to challenge the search of the suitcase in which contraband was found. *See generally, Rakes v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

**3.** The government did not and does not contend that Trooper Hodges had probable cause to search the vehicle. The government relies on the consent given by defendant McBean as its

authority for the search of the car and the luggage found within the car; therefore, the Court need not speculate as to whether certain (here unarticulated) facts or circumstances could have aroused a reasonable man to believe that evidence of a crime was likely to be found in the vehicle, thereby obviating the need for consent.

498

tained inside the vehicle, because the officers could reasonably assume that the narcotics would be found there.'" (Government's Supplemental Memorandum at 3–4 (*quoting Kapperman,* 764 F.2d at 994)). Further, the government contends that *Kapperman* provides that, unless there is an objection limiting the scope of the search in some manner, a consent to search a vehicle, house, or other premises includes all containers therein. (Government's Supplemental Memorandum at 4 (*citing Kapperman,* 764 F.2d at 794–5)).

■ What the government fails to identify, and the key to interpreting the very pregnant language of *Kapperman,* is that in *Kapperman,* the government was looking for drugs and had made that clear to the consenter; thus, the authorization permitted search of luggage, "because the officers could reasonably assume that the narcotics would be found there." 764 F.2d at 794. *Kapperman* by no means allows for the arbitrary rummaging through of closed containers in a consent search. The scope of a consent search is limited by the scope of permission given. *United States v. Milian–Rodriquez,* 759 F.2d 1558, 1563 (11th Cir.1985) ("[a] suspect's consent can impose limits on the scope of a search in the same way as do specifications of a warrant. Moreover, the government may not use consent to a search which was initially described as narrow as license to conduct a general search"); *Mason v. Pulliam,* 557 F.2d 426, 429 (5th Cir.1977) ("[w]hen the basis for the search or seizure is consent, the government must conform to the limitations placed upon the right granted"). And, the scope of permission is generally indicated by the object of the search. *United States v. Ross,* 456 U.S. 798, 820, 102 S.Ct. 2157, 2170, 72 L.Ed.2d 572 (1982) ("[a] lawful search of fixed premises generally extends to the entire area *in which the object of the search may be found* and is not limited by the possibility that separate acts of entry or opening may be required to complete the search") (emphasis added) (quoted in *Kapperman* and *United States v. White,* 706 F.2d 806 (7th Cir.1983) as applicable, by analogy, to consent searches).

Thus, in assessing whether Trooper Hodges, pursuant to consent given by defendant McBean, was constitutionally authorized to search the closed luggage found in the trunk of the car, the Court looks to the scope of the consent given, in light of the purported object of the search. The Court is not bound by the bald words of the actors in making its determination, rather, the Court seeks illumination and guidance from an examination of the circumstances surrounding the giving of the consent. *Kapperman,* 764 F.2d at 794; *Covello,* 657 F.2d 155.

■ After handing McBean the warning citations, and while the defendant was scrutinizing the citations given to him, Hodges asked, in a passing manner, "do you mind if I take a look in the car," to which the defendant casually responded, "no, go ahead." McBean's consent was to "a look in the car." The scope of the search is limited by the scope of the consent, and in this case, the scope of the consent given was limited by the scope of the request made. The Court has considered the reasonable meaning of Hodges' request to "a look in the car." It would be dishonest to construe "a look in the car", as indicative of anything other than *a look in the car.* Thus, fair interpretations of the request may include the trunk of the car, under its seats, or in the glove compartment, but "[s]uitcases, footlockers and briefcases are frequently the objects of a man's highest privacy expectations," *United States v. Gilley,* 608 F.Supp. 1065 (S.D. Ga.1985), and, without some indication that the request included such personal items, this Court will not presume that "a look in the car" means "a look in the car and all closed containers found in the car."

Had there been some indication by Trooper Hodges that he was looking for drugs, or even if, under the circumstances, an objectively reasonable interpretation of the request was "a look in the car *for drugs,*" then, under *Kapperman,* a search could include a suitcase found in the car because it would be reasonable to assume that drugs could be found therein. How-

ever, the circumstances of the request and consent at issue do not support such an interpretation. Trooper Hodges did not indicate in any manner that the object of his search request was to find drugs, and the Court will not credit the defendant with telepathic powers.

Of course, the analysis does not end with an examination of the verbal consent, for Trooper Hodges procured McBean's signature on a written waiver. After receiving verbal permission, Hodges obtained the written form and, having established that the defendant was capable of reading, asked the defendant to read it before he signed. McBean did not read the form before he signed it. That McBean signed the waiver without reading it was obvious to the Court upon viewing the videotape; clearly, this was also obvious to Trooper Hodges at the time of the signing because Hodges took it upon himself carefully to explain to McBean what he decided not to read. Essentially, the search waiver provides that the signer voluntarily consents to a search of the described vehicle including the luggage and contents thereof, and that the signer possesses the right of refusal. (A copy of the written waiver signed by the defendant is attached to this Order as "Appendix A"). Hodges methodically read the terms of the waiver out loud to McBean. However, a viewing of the videotape establishes that *Hodges never read that portion of the waiver which gives permission to search luggage and contents of the vehicle.* The defendant was never made aware that the scope of his consent included closed luggage found in his vehicle. In other words, the consent given was still to "a look in the car" and thus did not authorize Hodges to open the luggage found in the trunk.

The written terms of the consent form clearly provide that all contents of the car are subject to the search. McBean, however, never read the form; this fact is too clear for debate. While *Kapperman* instructs that the terms of the document dictate the scope of the search, it cannot rationally be argued that such terms are binding on a defendant who does not read them—particularly when this is obvious to the official obtaining the consent. Clearly, the defendant did not read the form, and unless he was instructed of its terms, or otherwise made aware, he cannot unknowingly be held bound to a broader search than that to which he actually agreed. *Covello* and *Kapperman* make clear that the circumstances surrounding the giving of the consent give meaning to the words of the written waiver. Here, the defendant never read the written form. As far as he knew, his consent extended at most to a search of his car. Hodges never indicated otherwise, and in the absence of some authority—whether by permission or by indicating the object of the search—Hodges had no right to invade the privacy of the luggage found in defendant's vehicle.

The signing of a constitutional waiver is not to be equated with the signing of a commercial contract. The *Covello* court, in dicta, employs telling language in this regard:

> If the interpretation of the consent form were at issue in contract or property litigation, the language would be conclusive. There would hardly remain any issue for fact finding to resolve. We assume, however, at least arguendo, that in a criminal law search and seizure context, a party consenting in writing to a search may be more free to impeach the document he adopted by his signature, which we may call a contract of adhesion. We thus assume it is still necessary to draw factual conclusions from the totality of the circumstances, even though the difficulty confronting [the defendant] ... in explaining away his own signature is still formidable.

*Covello*, 657 at 155.

The facts of the case at bar are recorded on film and cannot be controverted; the defendant placed his signature on a form that he did not read. In assessing the extent to which courts have held an individual bound to an unread fourth amendment waiver, the Court draws guidance (in the same manner as at least one other court has, *see United States v. Prescott*, 480 F.Supp. 554 (W.D.Pa.1979)), from the analo-

gous situation of the giving of a fifth amendment waiver.

In the context of waiver of *Miranda,* the courts uniformly hold that warnings provided to an accused solely in written form, will satisfy constitutional mandates. *See United States v. Sledge,* 546 F.2d 1120 (4th Cir.1977); *United States v. Coleman,* 524 F.2d 593 (10th Cir.1975); *United. States v. Bailey,* 468 F.2d 652 (5th Cir.1972); *United States v. Alexander,* 441 F.2d 403 (3rd Cir.1971); *United. States v. Osterburg,* 423 F.2d 704 (9th Cir.1970). The inquiries in this regard are whether the defendant was fully advised of his rights, and whether he understood them. Critical to this determination is (of course) whether the accused has read the form provided to him; the majority of cases explicitly cite this as a determinative factor: "the defendant admitted he could read and write, was given a legally sufficient rights form, *was observed reading it,* orally admitted that he fully understood his rights and then signed a legally sufficient waiver," *Sledge,* 546 F.2d at 1122 (emphasis added); "[w]e are unwilling to hold ... that a printed card *read by a person shown to have understood* the warnings cannot satisfy Miranda," *Bailey,* 468 F.2d at 660 (emphasis added); "[t]he requirement is that the police fully advise such a person of his rights, and *appellant made no showing that he did not read* or understand the written warnings," *Alexander,* 441 F.2d at 404 (emphasis added).

The Court finds the former Fifth Circuit decision, *United States v. Van Dusen,* 431 F.2d 1278 (1st Cir.1970), particularly probative of the instant issue. In *Van Dusen,* the defendant was under the impression that his decision not to sign a *Miranda* waiver would, of itself, preclude the use in evidence of subsequent statements rendered by him. The defendant gave incriminating statements after having refused to sign a written *Miranda* form. The *Van Dusen* court found that, despite the lack of his signature on the written form, because the defendant could read, had the opportu-

nity to read, apparently did read, and indicated he understood, he was adequately apprised of his rights.

The instant case is a negative imprint of the *Van Dusen* rationale. Here, despite the fact that the defendant *did sign,* it was clear that *he did not read,* thus he should not be charged with consenting to, or being aware of, a broader search than that to which he actually agreed.

Relevant to the Court's decision is the fact that Hodges endeavored to instruct McBean about the nature of his fourth amendment waiver. In this connection, Hodges read, out loud, the form to which McBean had been oblivious. This task, once undertaken, should have been done properly. For Hodges to omit such a significant matter as the proposed scope of the search creates a misleading situation. To hold the defendant responsible to that which he was not made aware is unreasonable.[4]

One further point needs to be addressed. It is clear, from viewing the videotape, that the defendant had ample time to object to the opening of luggage, and thus terminate the search. Hodges had opened the trunk, and, before zipping open the suitcase wherein the marijuana was found, asked the defendant a number of questions regarding ownership of the suitcase. During this time, the defendant voiced no objection to the search, and he had opportunity to do so.

*Kapperman,* relying on *United States v. Dichiarinte,* 445 F.2d 126 (7th Cir.1971), indicates that whether a consenter at some point objects to an ongoing search is a significant inquiry into determining whether there is a limitation placed on the scope of the consent that had been granted. 764 F.2d 794–95. This is perfectly sensible; if a search is undertaken pursuant to permission, then the scope of the search can, in the absence of other circumstances, be limited by the consenter, whether at the outset

---

**4.** Taking this concept to the extreme for illustration: One could not seriously argue that, had the waiver form, signed by the defendant but read only in part by Hodges, allowed for the

search of the consenter's body cavities, defendant would have unknowingly consented to a *full body* search.

or at some time during the search. *See Mason v. Pulliam,* 557 F.2d 426 (5th Cir. 1977) (voluntary consent is implicitly limited by right to withdraw consent and reinvoke Fourth Amendment rights). But *Kapperman* and *Dichiarinte* do not propose and cannot be read as requiring that one must voice objection to prevent or limit a search *to which he never acquiesced in the first place.* Such a reading would shift the burden of the fourth amendment: In essence, all searches presumptively reasonable until objection is voiced.

The Court's research has uncovered five cases of immediate relevance to the instant topic. Each found the failure of the defendant to object or otherwise express concern during a search indicated that the scope of the search was within the bounds of the consent given. Significantly, each of these decisions distinctly relies on the particular facts of its case. And, each set of facts in those cases may be distinguished from the facts presented here.

The former Fifth Circuit has touched on the issue. Although binding precedent on this Court, *United States v. Miller,* 491 F.2d 638 (5th Cir.1974), is of little applicability. In *Miller,* the circuit court reviewed a dismissal of various counts of an indictment that included tax related charges. One facet of *Miller* dealt with the scope of a consent search. The defendant, by letter, agreed to allow the I.R.S. to review certain documents on premises specified by him, in lieu of compliance with an I.R.S. summons which would have required the production of the records at a government office. The I.R.S. removed the documents from the designated premises; the defendant claimed that such conduct exceeded the scope of consent given. The circuit court, in reversing the district court, held first, that the consent initially given allowed the removal of documents from the designated premises and, second, even if the initial consent was found to limit examination of the documents only on the premises specified by the defendant, the subsequent removal of the documents "was effected without incident, and indeed, appeared to have been acquiesced in", thus, "[i]n view of the circumstances under which the records were removed ... whatever limited consent was expressed in the letter sent to [the] I.R.S. ... was vitiated." *Id.* at 651.

*Miller* may be distinguished on a number of points. First, the *Miller* court found that the initial consent was wide enough in scope to include the objectionable conduct. In the case at bar, the scope of the initial consent was not wide enough in scope to include the objectionable conduct. Second, the *Miller* case involved an affirmative undertaking by the defendant, permitting governmental access to certain records, in lieu of complying with a subpoena; the scope of the *Miller* search was defined by the defendant himself. In the instant case, the defendant summarily acquiesced to a governmental request; the scope of the search was not defined by McBean, rather, it was defined by Trooper Hodges, and, absent some reasonable indication by the defendant, a broader scope than that defined by the government should not be implied. Finally, and significantly, in *Miller* the defendant allowed the government to examine records in certain office space provided by him, but claimed an unconstitutional deviation of such consent when the documents were removed from the premises. It would be a monumental and totally inappropriate constitutional leap, if this Court were to use *Miller* as *stare decisis* for the proposition that, in the instant case, defendant's failure to object was a manifestation of consent; the privacy rights at issue in each case are vastly disparate. In *Miller,* the defendant objected to a removal of documents that had already been provided by him for governmental inspection— the objectionable conduct was, at best, a *de minimis* deprivation of privacy interests. The government was already authorized to photocopy the documents; removal of the originals was hardly a significant extension. In the instant case, the government, without consent, searched through a personal luggage bag—the extension from an automobile search to a luggage search implicates substantial privacy interests. *Miller* is only tangentially relevant here; to apply it to the facts at bar would be intellectually dishonest.

Closer on point, but not binding authority on this Court, are the cases of *United States v. Espinosa*, 782 F.2d 888 (10th Cir. 1986) and *United States v. Sierra–Hernandez*, 581 F.2d 760 (9th Cir.1978). Both cases involve the search of vehicles, and in both cases the defendant contended that the search exceeded the scope of consent.

In *Sierra–Hernandez*, the officer received permission from the defendant when he asked to "look inside the trunk." The officer looked under the trunk, but then continued his search through the cab, and, ultimately, under the hood where he found marijuana. The circuit court, in affirming the district court, held that under the circumstances the defendant's failure to express concern or objection when the officer proceeded to the hood indicated that the search was within the initial scope of the consent. 581 F.2d 764.

In *Espinoza*, the officer received permission to "look through" the car. The officer systematically searched the entire car. He looked through the trunk, then, *upon receiving explicit permission*, looked through luggage found in the trunk. He continued through the cab, glove compartment, under the dashboard, under rugs, and behind seats. Noticing loose paneling and missing screws behind the back seat, the officer lifted a corner of the paneling and found cocaine. The circuit court, in affirming the district court, held that under the circumstances defendant's failure to object indicated that the scope of the search was within the bounds of the consent. 782 F.2d 892.

Both cases may be distinguished, but *Espinoza* particularly. In *Espinoza* the officer had explicitly indicated to the defendants that he was concerned about the transportation of drugs; given this distinction, consent to search the car would have necessarily included all areas in which drugs reasonably could have been hidden. (*See supra* pp. 497–499 of this Order). The more important distinction, applicable to both cases, is that in each, the officers had asked for permission to search the car or areas within the car, and *kept their*

*search to areas of the car itself.* (Notably, in *Espinoza*, the official specifically asked for permission to look through the defendants' luggage before doing so). The extension of a search from one area of a car to another area of the car does not amount to a substantial increase in the intrusiveness of a search as does the extension from a search of a car to the search of personal luggage. Should this Court accept the two as equivalent, the same rational would just as easily allow further extension of the doctrine into other, even more personal areas. Similar to the *Miller* analysis above, the Court is not willing to accept this quantum leap in fourth amendment intrusion without specific guidance.

In line with *Espinoza* and *Sierra–Hernandez*, are the cases of *United States v. Hardin*, 710 F.2d 1231 (7th Cir.1983) and *United States v. Lopez–Diaz*, 630 F.2d 661 (9th Cir.1980). These cases provide no further guidance on the instant issue, despite the fact that there too the courts found that failure to object to a search indicated that the search fell within the scope of consent. The critical similarity among all the cases heretofore cited is the appellate courts' reliance on the findings of the district court below. *None of the cases holds, as a matter of law, that failure to object to a search is equivalent to consent.* Rather, (with the exception of *Miller*) each merely upholds the lower court determination by concluding, based on the facts before it, the district court decision was not clearly erroneous.

■ The Court has carefully considered the above case law with reference to the instant facts. As a matter of law, it cannot be said that failure to object to a search equals consent to the search. As a matter of fact, it cannot be said that defendant's failure to object under the circumstance of this case indicated his acquiescence to a search of the luggage. The trooper had no right to look inside the luggage from the outset, and an objection should not be required to prevent that which the trooper already had no right to do.[5]

5. At the time of the search, the defendant was

being closely "watched" by a second trooper

The Court echoes Eleventh Circuit sentiment:

> We are not unsympathetic to the government's strong desire to eradicate drug trafficking: we recognize that illegal drugs pose a tremendous threat to the integrity of our system of government. We must not forget, however, that at the core of this system lies the Constitution, with its guarantees of individuals' rights. We cannot permit these rights to become fatalities of the government's war on drugs.

*U.S. v. $38,000.00 In U.S. Currency*, 816 F.2d 1538, 1548 (11th Cir.1987).

Defendant McBean consented to a search of his car. Trooper Hodges searched luggage found in the car, without having identified the object of his search or receiving permission to extend the scope of the original consent. The Court sees no reason to cheat the defendant of his fourth amendment protections because of governmental deception or error.[6] The evidence secured in *United States v. McBean* was the product of an unconstitutional search. Accordingly, and for the foregoing reasons, all evidence found in the luggage bag heretofore identified and discussed is suppressed.

---

that was called to the scene. To require an individual to object to a search of a personal area over which consent was never given, in order to limit the search, is unreasonable. The coercive conditions under which the defendant was placed would make this requirement even more unjust.

6. Notwithstanding the Supreme Court's apparent extension of the "good faith" exception to warrantless searches, *see Illinois v. Krull*, 40 Cr.L. 3327 (1987), the Court is not willing to apply the doctrine to the facts at bar. Perhaps Trooper Hodges subjectively believed he had outlined the full breadth of his intended search when he read the waiver to the defendant; yet, upon careful review of the videotape, the Court is of the firm conviction that an objectively reasonable officer would have noted that, having failed to identify the object of the search, and having failed to define the full scope of the search, personal luggage was "out-of-bounds." "[T]he 'prime purpose' of the exclusionary rule

'is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures.'" *Krull, supra*, at 3329 (*quoting United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974)). The "good faith" exception to the exclusionary rule should be applied when an officer's conduct is unlawful but still objectively reasonable because excluding the evidence under such circumstances would not deter police misconduct, hence not further the ends of the exclusionary rule in any appreciable way. *United States v. Leon*, 468 U.S. 897, 920, 104 S.Ct. 3405, 3419, 82 L.Ed.2d 677 (1984). My holding in this case furthers the purpose of the exclusionary rule; it forces officers to act reasonably in the context of consent searches by placing the minimal burden upon them either to identify the object of their search or to define the scope of their search. Application of the good faith doctrine to the case at bar would foster police deception in consent searches.

504

APPENDIX A

Department of Public Safety
Search Waiver

Consent to Search

I _Gavin McBean_, HEREBY GRANT MY CONSENT TO

_TFC B. Hodges_ AND _____,OFFICER(S)
NAME, RANK, BADGE NO.          NAME, RANK, BADGE NO.

OF THE DEPARTMENT OF PUBLIC SAFETY, STATE OF GEORGIA, TO SEARCH THE FOLLOWING :

VEHICLE DESCRIBED AS :

_White_ COLOR: _Buick_ YEAR: _1987_ MAKE: _Century_ BODY STYLE:

(NK) _675-ZUN_ LICENSE NUMBER:_____ VEHICLE IDENTIFICATION #:

•INCLUDING LUGGAGE AND CONTENTS THEREOF

I UNDERSTAND THAT I HAVE THE RIGHT TO REFUSE TO CONSENT TO THE SEARCH DESCRIBED
ABOVE AND TO REFUSE TO SIGN THIS FORM.

I FURTHER STATE THAT NO PROMISES, THREATS, FORCE, OR PHYSICAL OR MENTAL COERCION
OF ANY KIND WHATSOEVER HAVE BEEN USED AGAINST ME TO GET ME TO CONSENT TO THE SEARCH
DESCRIBED ABOVE OR TO SIGN THIS FORM.

DATE _10-8-87_
TIME _409 AM_

X _____
SIGNATURE OF CONSENTEE

WITNESSES: _TFC B. Hodges_
_____
_____

73-0064-21-88